### The PEOPLE of the State of Colorado, Complainant.

v.

### Derek W. COLE, Respondent.

### No. 10PDJ088.

Office of the Presiding Disciplinary Judge of the Supreme Court of Colorado.

Nov. 30, 2011.

**OPINION AND DECISION IMPOSING SANCTIONS PURSUANT TO C.R.C.P. 251.19(b)**

On September 27 and 28, 2011, a Hearing Board composed of Douglas D. Piersel and Terry F. Rogers, members of the bar, and William R. Lucero, the Presiding Disciplinary Judge ("the PDJ"), held a C.R.C.P. 251.18 hearing. Adam J. Espinosa appeared on behalf of the Office of Attorney Regulation Counsel ("the People"), and Derek W. Cole ("Respondent") appeared pro se. The Hearing Board now issues the following "Opinion and Decision Imposing Sanctions Pursuant to C.R.C.P. 251.19(b)."

### I. *SUMMARY*

The People allege Respondent violated Colo. RPC 1.1 by failing to competently represent his client, who was accused of sexual assault on a child, pattern of abuse. They contend that Respondent, who had never before accepted a case involving such charges, did not acquire sufficient knowledge or skill to conduct the client's defense, nor did he adequately prepare or investigate the case.

The Hearing Board agrees and finds Respondent violated Colo. RPC 1.1, warranting a suspension of his law license for ninety days.

### II. *PROCEDURAL HISTORY*

The People filed a complaint against Respondent on August 13, 2010. On September 8, 2010, Respondent filed a motion seeking an enlargement of time to file his answer, and the PDJ granted him a new deadline of September 27, 2010. On that date, Respondent filed motions seeking dismissal of the case or, in the alternative, an order compelling the People to respond to his demands for records. The PDJ denied both of Respondent's motions. After obtaining another extension of time, Respondent filed his answer on November 15, 2010.

The People then filed a motion for a more definite statement pursuant to C.R.C.P. 12(e), which the PDJ denied on January 20, 2011. The PDJ also denied on February 18, 2011, Respondent's request to continue the scheduled disciplinary hearing. Following a telephonic status conference on March 22, 2011, the PDJ ruled on a number of discovery issues arising out of the People's deposition of Respondent. The PDJ also made rulings concerning several issues during a pre-hearing conference held on March 28, 2011.

On the morning of April 20, 2011, the first day of a scheduled two-day hearing, the People informed the PDJ that Respondent's former client Allen William Toner, a key witness who is currently incarcerated and was appealing his conviction, would refuse to testify. Respondent requested a continuance of the hearing due to constitutional Confrontation Clause concerns, and the People did not object to a continuance. Out of an abundance of caution, the PDJ continued the hearing. On May 11, 2011, the PDJ denied Respondent's motions—both filed on the eve of the April hearing—seeking to recuse the PDJ and Hearing Board member Douglas D. Piersel.

The hearing was rescheduled for September 27 and 28, 2011. At that hearing, Lori Maier, Tamara (Knoepfle) Hoffscheldt, Lori McKay, Sandra Embry, Steven Jacobson,

Mary Kay Bunting,[1] S.G.,[2] and Respondent testified. The PDJ admitted the People's exhibits 1–6, 8–12, 15–25,[3] and 27–28. Respondent did not move to introduce any exhibits, but at Respondent's request the PDJ took judicial notice of the court of appeals' unpublished decision in *People v. Toner*, case number 09CA0971 (June 16, 2011).[4]

## III. FINDINGS OF FACT AND RULE VIOLATIONS

Respondent took the oath of admission and was admitted to the bar of the Colorado Supreme Court on June 7, 1985, under attorney registration number 14761. He is thus subject to the jurisdiction of the Hearing Board in these disciplinary proceedings.[5]

On January 27, 2003, Allen William Toner ("Toner"), along with his wife, Mary Kay Toner ("Ms. Toner"), visited Respondent in anticipation that Toner would soon thereafter face criminal charges alleging he had sexually assaulted his thirteen-year-old niece. Toner's brother-in-law had discovered a letter in the trash, written by his daughter and addressed to Toner, discussing their sexual contact. Toner's brother-in-law confronted Toner, who then sought Respondent's counsel. Respondent testified that the Toners wanted an attorney "on standby to be a buffer" between Toner and law enforcement, since Toner was "basically waiting for law enforcement to show up at his door." During the meeting, the Toners paid Respondent $300.00 in cash for two future hours of attorney services;[6] Ms. Toner also recalled Respondent advising them as to the penalties associated with possible charges by showing them a table in a book concerning various classes of felonies. She did not recall any discussion of indeterminate sentencing during that consultation.

In late March 2003, an arrest warrant for Toner issued in *People v. Toner*, Adams County District Court case number 03CR820.[7] The Adams County District Attorney alleged that on several occasions Toner had sexually assaulted his niece, charging Toner with sexual assault on a child by a person in a position of trust, a class three felony; sexual assault on a child, pattern of abuse, a class three felony; and sexual assault on a child, a class four felony.

Toner formally retained Respondent on April 1, 2003. During a meeting that day, which lasted for seven-tenths of an hour,[8] Toner and Respondent discussed the criminal charges, negotiated the terms of the representation, and arranged for payment. Because Respondent had reason to believe that Pueblo County might also bring charges against Toner, Respondent asked Toner to sign two fee agreements for a $1,000.00 flat fee[9] for representation in Pueblo and Adams Counties.[10]

---

1. Mary Kay Bunting was formally known as Mary Kay Toner. She then changed her name to Mary Kay Ferrell and later to Mary Kay Bunting.

2. We identify the victim's mother by her initials.

3. Exhibits 15 through 24 are transcripts of various hearings. Copies of these transcripts were admitted into evidence. After Respondent questioned the authenticity of these transcripts, the People called to the stand the court reporters who had transcribed them and introduced the sealed official transcripts during their testimony.

4. In assessing the testimony and evidence presented, the Hearing Board is guided by C.R.C.P. 251.18(d), which provides in part that "proof shall be clear and convincing evidence."

5. *See* C.R.C.P. 251.1(b). Respondent's registered business address is 1532 Galena Street, Suite 280, Aurora, Colorado 80010–2292.

6. Exs. 2 & 5.

7. Ex. 1.

8. Ex. 8. Respondent agrees his billing invoices reflect that this meeting lasted approximately forty-two minutes, but he could not recall whether these records accurately capture all the time he spent conferring with Toner. Indeed, throughout the disciplinary hearing Respondent contended his invoices fail to capture all the time he spent on Toner's case. But we cannot adopt Respondent's characterization of these records. Respondent's billing invoices are meticulous, recording his activities down to just one-tenth of an hour, and thus we find by clear and convincing evidence that they completely encapsulate the full extent of his work on Toner's matter.

9. Exs. 3–4 & 6. The Toners later paid Respondent an additional $500.00 for his work on the case. Ex. 6.

10. The Pueblo County District Attorney never filed charges against Toner.

Between April 1, 2003, and April 14, 2003—the date of Toner's bond hearing—Respondent and Toner only spoke for six minutes.[11] Respondent appeared at the bond hearing and requested a preliminary hearing in order to preserve Toner's rights.[12] Thereafter, Respondent did just over an hour of work in preparation for the scheduled May 27, 2003, preliminary hearing,[13] which he did not attend; Toner, who did appear, reported to the court that Respondent had been hospitalized with a pinched nerve.[14] Toner requested a continuance, which the court granted, resetting the preliminary hearing for July 7, 2003.[15]

Just a week before the preliminary hearing, Respondent submitted a written motion seeking to reschedule the preliminary hearing or, in the alternative, waive it; his motion indicated that the July 7, 2003, setting, which had not been cleared with his calendar, conflicted with a planned vacation.[16] Having received no ruling on his motion to reschedule, Respondent did not appear before the court on July 7, 2003, and instead advised Toner to waive the preliminary hearing, even though Respondent had not obtained or reviewed the prosecution's discovery at that point.[17] At the disciplinary hearing, Respondent defended this decision, arguing that his strategy was to curry favor with the deputy district attorney by waiving the preliminary hearing, which he thought would be a "good bargaining chip."

Not until July 15, 2003, did Respondent pick up the deputy district attorney's discovery file in Toner's case,[18] which included a videotape of an interview of the victim conducted by the police. Two weeks later, on July 29, 2003, Respondent and Toner appeared for an arraignment hearing, during which Toner pled not guilty.[19] The case was set for a jury trial on December 3, 2003.[20]

In late August 2003, Respondent suffered a significant stroke that, as he recalled, left him hospitalized for six to eight weeks. Respondent testified the stroke did "physical damage to his brain" and for a while it was "touch and go," since he was "very much in a fog." Although Respondent remembered feeling "concerned for a time" about his capacity to represent others, he regained confidence: "as I got through further, I felt I was able to understand.... I didn't feel I wasn't capable of working [on] the case." Respondent also said he advised Toner that he was free to retain new counsel, but, according to Respondent, Toner declined to do so.

As a result of his incapacitation, Respondent did not appear for the motions hearing on September 26, 2003. During the motions hearing, the deputy district attorney notified the court that Respondent's paralegal had contacted him with the news of Respondent's stroke, and Toner mentioned that he had received the same information from Respondent's associate.[21] Following his recovery, Respondent did not seek additional time to file pre-trial motions concerning application of the spousal privilege, the propriety of piercing the rape-shield statute, the hearsay testimony of the victim, or the victim's competency to testify. At the disciplinary hearing, he explained this was because he never planned to file pre-trial motions in Toner's case in the first place, since his "evaluation of the case was that there were no motions ... eligible or worthy to file." He also inveighed against the suggestion that he should have made efforts to pierce the rape-shield statute or challenge the victim's competency: "I wouldn't have done that to a child. My ethic is stronger than that.... If I've got to be responsible for making a child who is telling the truth go through a lot of stress, I just

11. Exs. 8–9.

12. Ex. 15 at 2:16–23.

13. Ex. 10.

14. Ex. 16 at 2:9–10.

15. *Id.* at 2:7–3:8.

16. Ex. 27 at 42–43.

17. Ex. 17 at 4:3–4.

18. Ex. 11.

19. Ex. 18 at 2:9–12.

20. *Id.* at 2:25–3:2.

21. Ex. 19 at 2:13–3:4.

can't do that. I'm not going to antagonize a poor child."

In preparation for the trial setting on December 3, 2003, Respondent reviewed the prosecution's discovery and spoke with Toner, Ms. Toner, and the detective assigned to the case. He admitted, however, that he did not conduct any other investigation to ascertain the accuracy of the victim's videotaped statements, request that Toner undergo a psycho-sexual evaluation, contact any witnesses endorsed by the prosecution, obtain the outcry letter written by the victim, independently search for physical evidence, procure the drawings created by the victim during her videotaped interview, endorse or subpoena any lay witnesses for trial, or consult with or hire any expert witnesses.

Respondent testified at the disciplinary hearing that all lay witnesses were "against" Toner, so he chose not to endorse any; that he asked the deputy district attorney for all discovery; that he did not deem a psychosexual evaluation necessary; and that he chose not to interview witnesses or conduct further investigation because he did not want to enrage Toner's family by "stirr[ing] up a hornet's nest." Rather than "bash[ing] around like a bull in a china shop," he said he determined to "finely, delicately navigate around the wasteland" of the case by placating the deputy district attorney in the hopes of securing his lenience during plea bargaining. Respondent also contended that any such investigation on his part was unnecessary and unwanted, since Toner never insisted Respondent undertake any specific work and in fact wished to plead guilty in order to spare his family the trauma of a trial. Somewhat paradoxically, however, Respondent also testified that throughout the representation Toner "went back and forth" regarding whether he should go to trial and often tried to convince Respondent to claim that the child victim had seduced Toner.

Respondent and Toner appeared at a pretrial conference on November 26, 2003. During that hearing, Respondent advised the court that Toner wished to consider making a plea but requested additional time to consult with a surety so Toner could remain on bond.[22] The court advised Respondent that, should Toner plead guilty to sexual assault on a child under the age of fifteen, Toner would not be bond-eligible.[23] At Respondent's request, the court continued the pretrial conference until December 1, 2003.[24]

On December 1, 2003, Respondent and Toner again appeared before the court to enter a plea. Per the agreement with the deputy district attorney, Toner pled guilty to the most serious charge against him—sexual assault on a child, pattern of abuse—and in return the deputy district attorney dismissed the two remaining lesser charges.[25]

After Respondent announced Toner wished to enter this plea, the court advised Toner that such a plea would carry a minimum prison sentence of ten years and a maximum sentence of indeterminate length, not to exceed life in prison, followed by a minimum of twenty years of parole.[26] The court also made clear that "this could be a lifetime sentence"[27] and that Toner "would not be eligible for probation."[28] Ms. Toner, who was in the courtroom, remembered feeling this sentence was "one-hundred times worse" than she had expected, since she did not believe Respondent had ever addressed the possibility of a lifetime sentence with her. S.G., Toner's sister-in-law and the mother of the victim, was also present in the courtroom that day; she testified that based on her observations of Toner, what she saw "was shock—he collapsed into his chair." As S.G. remarked, Toner's reaction was not consistent, "body language-wise," with someone who knew beforehand what he was facing.

During this advisement, Respondent requested a break in the proceedings to discuss with Toner the sentencing scheme, saying,

22. Ex. 20 at 3:16–21.

23. *Id.* at 3:22–25.

24. *Id.* at 5:5–16.

25. *Id.* at 3:6–12.

26. *Id.* at 4:3–6:19.

27. *Id.* at 4:16

28. *Id.* at 6:6–7.

"Your Honor, I would like to discuss this with my client, see if he still wishes to enter his plea based on the *new information.* ... I was confused." [29] At the disciplinary hearing, Respondent testified that the court's sentencing advisement was "a little different" from what he had expected based on his research, and it was incumbent on him to ensure Toner had a complete understanding of the penalties he faced. "I wanted to make sure if there was something different than I had told him, that there was no more confusion," Respondent said. After a pause in the proceedings to confer, Toner pled guilty, as planned, to sexual assault on a child, pattern of abuse.

On February 9, 2004, the court held a sentencing hearing. Respondent attempted to call to the stand Jack Tagger, a counselor who had been working with Toner, but the court made clear defense witnesses did not have a right to speak.[30] The prosecutor requested the minimum mandatory sentence, given that Toner had "stepped up to the plate" by acknowledging his crime, thereby avoiding the need for trial and consequent trauma to the victim, who would have had to testify.[31] Respondent then argued for probation, but the judge again instructed him that the plea carried a mandatory prison sentence and probation was not legally possible.[32] Toner received a prison sentence of ten years to life, with a parole period of twenty years to life.[33]

In early 2007, the court appointed Gregory Lansky ("Lansky") as alternate defense counsel. With Lansky's assistance, Toner filed a motion for post-conviction relief, alleging ineffective assistance of counsel pursuant to Crim. P. 35(c). Lansky hired Steven Jacobson, Esq. ("Jacobson"), as an expert witness in the field of criminal defense.[34] As Lansky requested, Respondent tendered his entire file for the Toner case to Lansky and Jacobson, and Jacobson reviewed the file's contents.

Hearings were held on Toner's Crim. P. 35(c) motion on March 13, 2009, and April 9, 2009. Respondent testified, as did Jacobson, who was qualified as an expert and, in that capacity, asserted that Respondent's performance as counsel fell well below the professional standards of the Colorado legal community.[35] Despite this testimony, the trial court denied Toner's motion for post-conviction relief, finding that Respondent's representation of Toner was deficient but did not result in prejudice to Toner, since Toner would have pled guilty regardless of Respondent's performance as his attorney. The court reasoned that Toner evidenced an overwhelming sense of guilt and remorse, as well as a desire to avoid further harm to his entire family, and therefore Lansky failed to present evidence showing that a trial would have produced a different result. The court also held that the plea agreement conferred on Toner the benefit of avoiding consecutive sentences. Finally, the court reduced Toner's sentence from ten years to eight to correct an error in the original sentence.

Toner appealed. The court of appeals found no prejudice had accrued to Toner, given that there was overwhelming evidence of Toner's guilt and remorse, as well as the fact that Toner benefitted from a negotiated plea that reduced the number of charges and eliminated the risk of consecutive sentences. As such, it affirmed the trial court's judgment without additional inquiry into whether Respondent's representation was deficient. Toner remains incarcerated with the Colorado Department of Corrections.

The People plead but one claim in this disciplinary proceeding: that Respondent violated Colo. RPC 1.1, which provides that a lawyer must competently represent clients. According to the rule, competent representation requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation. In bringing this

29. Ex. 21 at 5:12–15 (emphasis added).

30. Ex. 22 at 3:3–14.

31. *Id.* at 5:16–6:14.

32. *Id.* at 9:4–24.

33. *Id.* at 10:18–22.

34. *See* Ex. 25, Jacobson's curriculum vitae current through March 2011.

35. Ex. 24 at 19:10–13.

claim, the People rely heavily on the expert witness testimony of Jacobson, who was qualified by the PDJ as an expert in criminal defense with a subspecialty in defense against charges of sexual assault on children.

In accord with the People's complaint,[36] Jacobson opined that Respondent's representation of Toner did not meet the competency standards demanded by Colo. RPC 1.1. His unfavorable appraisal of Respondent's representation can broadly be grouped into five categories of errors, as follows: (1) Respondent did not understand the penalties associated with the charges; (2) Respondent senselessly waived the preliminary hearing; (3) Respondent never asked Toner to sit for a psycho-sexual evaluation; (4) Respondent neglected to independently investigate the case and failed to file valid motions; and (5) Respondent did nothing to prepare for trial. We discuss each point in turn.

First, Jacobson believes Respondent lacked proper appreciation for the unique aspects of cases involving sexual assault on a child, particularly given that Toner's was the first such case Respondent had ever accepted. Jacobson explained that such charges demand a defense response akin to that which is appropriate in a murder case, since the presumption of innocence may erode in order to protect the child victim, the burden of proof may subtly shift, unusual evidentiary and hearsay rules apply, and, most salient, the possible penalties and sentencing schemes differ from those that normally govern felonies.[37] As evidence of Respondent's failure to study—and properly advise Toner of—the possible ramifications associated with his plea, Jacobson pointed to an absence of legal research concerning sentencing in Respondent's file, Respondent's failure to bill any time for such research, his minimal contact with Toner after mid-August 2003, and

Respondent's statements and Toner's reaction at the December 1, 2003, plea hearing.

Second, Jacobson objected to Respondent's waiver of the preliminary hearing. As the trial court explained to Toner, a preliminary hearing forces the prosecution to prove to the court that probable cause exists to believe the defendant has committed the alleged crimes.[38] At the disciplinary hearing, Jacobson expounded on this concept, noting that the preliminary hearing "freeze[s] facts" and exposes the child to cross-examination. For that reason, he said, a preliminary hearing is a right, and one waives it only when one receives something in exchange. Jacobson said that without discovery Respondent was in no position to advise Toner to take such an action, and he had never heard of an attorney advising a client to waive a preliminary hearing prior to the attorney reviewing discovery, remarking that it was "impossible to fathom what [Respondent's] strategy was," since Toner did not benefit from the waiver.

Third, Jacobson described a psycho-sexual evaluation as a *sine qua non* in defending against charges of sexual assault on a child, noting that in plea bargaining the results of a psycho-sexual evaluation offer the greatest opportunity for leverage in moving away from an indeterminate sentence. Jacobson painted psycho-sexual evaluations as entirely advantageous for the defense: if the results are favorable, they can be used to negotiate with the prosecution; if the results are adverse, they are not discoverable.[39]

Fourth, Jacobson challenged Respondent's decision not to undertake any independent investigation of the case or to file even one motion on Toner's behalf. In Jacobson's opinion, the case was "rife with possibility for impeachment," yet Respondent never probed to uncover certain facts, including inconsistencies and dubious accusations in the vic-

---

36. *See* Compl. ¶¶ 23(a)-(h).

37. As Jacobson observed, a defense attorney must plan his or her strategy in light of several factors. First, the defendant faces a possible life sentence. Second, practically speaking, parole is not available for at least twelve years. And third, even when parole is available, the parole rate for pattern sex offenders is one percent.

38. Ex. 17 at 3.

39. Jacobson also mentioned that psycho-sexual evaluations are useful in crafting a defense strategy. If the parties strike a plea, the court will order an evaluation for sentencing purposes, so defense lawyers know that adverse psycho-sexual evaluation results may militate against pleading and in favor of going to trial.

tim's recounting, as well as the victim's prior sexual history, which Jacobson suggested should have been used to argue the victim had transferred her knowledge base from earlier experiences to her interactions with Toner. Jacobson also faulted Respondent for failing to bring a motion to pierce the rape-shield statute, which would have allowed introduction of such evidence, and a motion to preclude Ms. Toner's testimony under the spousal privilege doctrine. In general, Jacobson reproached Respondent for viewing his defense efforts as inherently limited by Toner's admission of guilt, arguing that Respondent should have viewed such an admission not as heralding the "end of his job" but the beginning. "Part of a criminal lawyer's charge," he commented, "is to look under any rock" and raise "any colorable argument"; because Respondent did not do so, Jacobson concluded that Toner was deprived of zealous representation.

Finally, it was Jacobson's opinion that Respondent failed to adequately prepare for trial. While reviewing Respondent's file, Jacobson noted it contained none of the documents typically found in the file of a lawyer who anticipates going to trial. Jacobson found in the file no preliminary opening or closing statements, outlines for cross-examination of witnesses, draft jury instructions, or legal research of any kind. Jacobson suggested the file's contents, coupled with the low flat fee Respondent charged Toner, signals that Respondent never intended to take Toner's case to trial and had always planned to broker a plea deal.

Indeed, Jacobson theorizes that Respondent's orientation to the entire case was mirrored by the low fees he charged: Jacobson postulated that because Toner confessed his guilt to his family and to Respondent from the beginning, Respondent believed he need not defend against the substantive allegations and therefore charged Toner a fee reflective of his anticipated level of effort for the case. In fact, Respondent's testimony in the disciplinary hearing obliquely validates Jacobson's theory: Respondent said, "I set the fees based on the fact that when allegedly somebody tells the whole world they're guilty, I—it probably would be pretty unethical of me to, you know, ask for five or ten thousand dollars on the case. . . ."[40]

■ The Hearing Board agrees with Jacobson's analysis and finds Respondent failed to competently represent Toner in violation of Colo. RPC 1.1. The first comment to that rule indicates competent representation is determined by a constellation of factors, including

> the relative complexity and specialized nature of the matter, the lawyer's general experience, the lawyer's training and experience in the field in question, the preparation and study the lawyer is able to give the matter and whether it is feasible to refer the matter to, or associate or consult with, a lawyer of established competence in the field in question.[41]

When measured against these standards, Respondent's knowledge and skill fall woefully short of what is expected of Colorado lawyers, especially in a case where the stakes are so high. Toner's was Respondent's first case involving sexual assault on a child, yet Respondent failed to affiliate with a more experienced practitioner or to research and study the complicated and specialized statutes governing such charges.[42] Indeed, Respondent's conduct suggests he lacked understanding of the governing bail and sentencing schemes, was unfamiliar with the singular evidentiary rules that apply in such contexts, and was unaware that experienced practitioners in the field believe a psycho-sexual evalu-

---

**40.** *See also* Respondent's Hrg. Br. at 2 ("Respondent 'competently' represented Mr. Toner, at all stages of the latter's case, based upon the facts and information then know[n] to Respondent, much of which Respondent got from (1) Mr. Toner's own mouth, and (2) non-suppressible 'confessions' (of his guilt), made to family and friends, *before* Respondent was retained as counsel, which resulted in Respondent achieving the best possible result for Mr. Toner, based upon the 'totality' of all the facts and circumstances of Mr. Toner's case; then known by Respondent."). (Emphasis in original).

**41.** Colo. RPC 1.1 cmt. 1.

**42.** As Jacobson testified, many district attorneys' offices across the Front Range have developed specialized units designed exclusively to prosecute such actions.

ation is indispensible in defending against such charges.

We also conclude Respondent's thoroughness and preparation throughout the Toner case were wanting. Comment five to Colo. RPC 1.1 notes that competent handling of a matter requires an "inquiry into and analysis of the factual and legal elements of the problem," as well as sufficient attention and preparation, which is shaped in part "by what is at stake." As Jacobson explained, charges involving sexual assault on a child potentially carry life sentences with little chance of parole, so Respondent had a heightened duty to sedulously prepare both the factual and legal aspects of Toner's case, which he neglected to do.

Respondent's proffered justifications for failing to investigate are unavailing, in our view. Despite his protestation that little factual inquiry was necessary because Toner wished to "throw himself under the bus," Respondent also testified that Toner vacillated until the end as to whether to go to trial. But even if Toner wished to plead guilty, Respondent should have conducted more thorough preparation and investigated the charges. The Hearing Board finds clear and convincing evidence that such investigation was likely to have been fruitful. Had Respondent conducted interviews of key witnesses, he might have discovered that S.G. and her husband, the victim's parents, were of the strong opinion—as S.G. testified in the disciplinary hearing—that Toner's incarceration should last no more than ten years. Because Respondent never attempted to interview S.G., he was not aware of the potentially mitigating effect of her family's opinion in the sentencing portion of Toner's trial.

Moreover, Respondent's concern that additional investigation, even if fruitful, would have "terrorize[d] a child when I kn[e]w she was telling the truth," evidences a misguided notion of his obligations as a defense attorney. And Respondent's contention that his client's admissions limited the defense he could provide also founders, since "[t]he duty to investigate exists regardless of the ac-

cused's admissions or statements to defense counsel of facts constituting guilt or the accused's stated desire to plead guilty." [43] We therefore conclude Respondent violated Colo. RPC 1.1 by failing to competently represent Toner.

## IV. SANCTIONS

■ The American Bar Association *Standards for Imposing Lawyer Sanctions* (1991 & Supp. 1992) ("ABA *Standards*") and Colorado Supreme Court case law govern the selection and imposition of sanctions for lawyer misconduct. ABA *Standard* 3.0 mandates that, in selecting the appropriate sanction, the Hearing Board consider the duty breached, Respondent's mental state, the injury or potential injury caused, and the aggravating and mitigating evidence.

### ABA Standard 3.0—Duty, Mental State, and Injury

■ *Duty:* Respondent was vested with a duty to zealously represent his client. This duty encompasses the responsibility to acquire the requisite knowledge and skill in order to conduct a client's defense, to adequately prepare the matter, including inquiry into the legal and factual aspects of the case, and to use methods and procedures that meet the standards of competent Colorado practitioners. As we stated above, a lawyer is not relieved of these obligations because the client has confessed his guilt or is willing to plead guilty to the most serious charge.

■ *Mental State:* We conclude Respondent knowingly declined to arm himself with the necessary study and preparation to competently defend Toner.

■ *Injury:* Respondent argues Toner was not injured because he obtained for Toner the "best result he could get under the facts," citing in support the court of appeals' opinion affirming the trial court's Crim. P. 35(c) conclusions. The court of appeals reasoned that because Respondent negotiated a plea to reduce the number of charges and

---

**43.** *People v. May,* 745 P.2d 218, 221 (Colo.1987) (quoting I ABA *Standards for Criminal Justice,*

Defense Function § 4–4.1 (1986)).

eliminate the risk of consecutive sentences, Respondent's representation did not prejudice Toner.[44] But Jacobson viewed the court of appeals' conclusion with skepticism, opining that Respondent's efforts did not, in fact, enable Toner to avoid consecutive sentences, which were unlikely in the first place. As a result, Jacobson testified at the disciplinary hearing that had Respondent competently defended Toner, Toner likely could have benefitted from an outcome far more favorable than the sentence he ultimately received.

The task before us, however, is not to question the court of appeals' legal conclusions, which are based on altogether separate standards, but rather to determine whether Toner was harmed according to the definitions set forth in the ABA *Standards*. Here, it is enough to find that regardless of the outcome, Respondent's process and methods were flawed, threatening his client with great potential harm. Respondent advised Toner to accept the plea offer, which carried a mandatory indeterminate prison sentence; and Respondent did so without thoroughly investigating the case, even though he—and by extension Toner—failed to appreciate the legal consequences of such a plea. We therefore conclude Respondent caused Toner serious potential harm.[45]

### ABA Standard 9.0—Aggravating and Mitigating Factors

Aggravating circumstances are any factors that may justify an increase in the degree of discipline to be imposed, and mitigating circumstances are any considerations or factors that may justify a reduction in the severity of the sanction. The Hearing Board considers evidence of the following aggravating and mitigating factors in determining the appropriate sanction.

*Pattern of Misconduct—9.22(c):* The People argue we should consider a private admonition issued to Respondent in 2009 as a prior disciplinary offense pursuant to ABA *Standard* 9.22(a). That matter concerned a 2007 case wherein Respondent failed to represent his client diligently and neglected to reasonably communicate with the client in violation of Colo. RPC 1.3 and 1.4(a). Because the underlying events in the Toner case took place well before those addressed in the private admonition, we decline to consider that admonition as prior disciplinary history.[46] Instead, we consider the 2009 private admonition, together with the facts before us, as a nascent pattern of misconduct entitled to relatively little weight in aggravation.

*Refusal to Acknowledge Wrongful Nature of Conduct—9.22(g):* Respondent continues to maintain that he satisfied his professional obligations in Toner's representation, demonstrating both a misguided notion of a defense lawyer's ethical obligations to his or her clients and an intractable but erroneous belief that he adequately prepared Toner's case, even though he did so "differently" than other attorneys would.

*Substantial Experience in the Practice of Law—9.22(i):* Respondent has been licensed since 1985 and therefore has substantial experience in the practice of law, which we consider in aggravation.

*Personal or Emotional Problems—9.32(c):* In late August 2003, Respondent suffered a stroke that incapacitated him for almost two months-a critical time for prepa-

**44.** The court of appeals noted that post-conviction relief under Crim. P. 35(c), based on allegations of ineffective assistance of counsel, is appropriate only when the defendant proves by the preponderance of the evidence that both counsel's assistance was deficient and such performance prejudiced him; that is, but for counsel's deficiencies, the defendant would not have pled guilty but instead would have insisted on going to trial. *See Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *People v. Naranjo*, 840 P.2d 319, 325 (Colo.1992).

**45.** *See In re Fisher*, 202 P.3d 1186, 1194 (Colo. 2009) (affirming hearing board's finding that if attorney had taken steps to become familiar with standards and procedures prior to his client's termination of the attorney-client relationship, he could have informed his client of the potential injury she might suffer if she did not allow him to continue working to protect her interests).

**46.** *See People v. Williams*, 845 P.2d 1150, 1153 n. 3 (Colo.1993) (electing to consider another sanction, which was imposed after most of the conduct forming the basis of the disciplinary proceeding, as a pattern of misconduct rather than prior discipline); *People v. Honaker*, 863 P.2d 337, 340 (Colo.1993) (same).

ration and investigation in Toner's case. We accord only limited weight to this factor, since Respondent testified he was fully able to orchestrate Toner's defense to his own satisfaction following his hospitalization.

■ *Delay in Disciplinary Proceedings—9.32(j):* We consider this factor in mitigation, given that Respondent represented Toner in 2003 and early 2004, and the People filed their complaint in 2010. The intervening time, combined with the fact that Respondent later surrendered his entire file to Lansky, Toner's Crim. P. 35(c) counsel, probably hampered Respondent's recall of events.

*Failure of Injured Client to Complain—9.4(f):* Throughout this disciplinary proceeding, Respondent has emphasized that Toner never complained to the People. That Toner did not grieve Respondent in the disciplinary process, however, is considered neither an aggravating nor a mitigating factor.

### Sanctions Analysis Under ABA Standards and Case Law

We look, in this case, to ABA *Standards* 4.52 and 4.53. ABA *Standard* 4.52 provides that suspension is generally appropriate when a lawyer engages in an area of practice in which the lawyer knows he or she is not competent, thereby causing a client injury or potential injury. ABA *Standard* 4.53, meanwhile, calls for public censure when a lawyer exhibits failure to understand essential legal doctrines or procedures and therefore injures or potentially injures a client.

The People urge the Hearing Board to impose a six-month suspension with only ninety days served and the remainder stayed upon successful completion of a two-year pro-bationary period. They cite two precedential cases in support of such a sanction.[47] In the first, *People v. Proctor*, an attorney was suspended for six months for neglecting and incompetently handling a case involving sexual assault on a child, resulting in significant injury to his client and the legal system.[48] There, the attorney, who did not have prior disciplinary history, failed to move to change venue, use information he possessed that refuted the opinion of the prosecution's expert, interview a treating physician, consult with experts, follow up on his request for a medical examination of the victim, use an investigator, review certain prospective evidence, file motions to suppress hearsay statements, or study key legal authorities governing evidentiary issues in the case.[49]

The People also cite *People v. Myers*, a case where an attorney, who represented a client accused of sexual assault on a child in a position of trust, failed to investigate her client's case in an appropriate and timely manner, failed to timely file motions, and failed to order necessary transcripts, thereby violating Colo. RPC 1.1 and 1.3.[50] She also filed misleading witness and exhibit lists, which constituted dishonesty or misrepresentation in contravention of Colo. RPC 8.4(c).[51] Considering the attorney's recent disciplinary offenses, the seriousness of the misconduct, and the mitigating factor of personal or emotional problems, the Colorado Supreme Court suspended the attorney for thirty days.[52]

■ Although the Hearing Board located two cases imposing public censure for stand-alone violations of Colo. RPC 1.1,[53] those cases are not as factually analogous as *Proc-*

**47.** *See In re Roose*, 69 P.3d 43, 48 (Colo.2003) (stating that only the Colorado Supreme Court "has the power to determine the law of this jurisdiction as applied in disciplinary proceedings").

**48.** 922 P.2d 931, 932–33 (Colo.1996).

**49.** *Id.* at 932.

**50.** 908 P.2d 101, 101–02 (Colo.1995).

**51.** *Id.* at 102.

**52.** *Id.*

**53.** *See People v. Moskowitz*, 944 P.2d 76, 77 (Colo.1997) (publicly censuring attorney for failing to adequately prepare and investigate, which prevented him from realizing an involuntary bankruptcy petition was ill-advised and without factual or legal basis, but where several factors were found to mitigate the misconduct); *People v. Silvola*, 888 P.2d 244, 244–45 (Colo.1995) (imposing public censure where attorney incompetently represented his nephew on two felony theft charges, where such misconduct was aggravated by a prior admonition but mitigated by honesty and cooperation in disciplinary investigation).

*tor.* Accordingly, we follow *Proctor*'s example, since *Proctor* underscores that a defendant accused of sexual assault on a child may face a life sentence as a result of incompetent representation.[54] We therefore conclude a short period of suspension is warranted in this case. Nevertheless, in light of our finding that Respondent caused serious potential injury, as opposed to the finding of significant actual injury in *Proctor*, we cannot go so far as to impose a six-month suspension, as the People request. Accordingly, we determine that a suspension lasting ninety days is appropriate here.

## V. CONCLUSION

Defense lawyers, even those involved in defending against the most heinous charges, owe a duty of loyalty to their clients. This duty compels attorneys to competently represent their clients, which entails acquiring the requisite knowledge and adequately preparing and investigating their clients' cases. This duty transcends empathy for the alleged victim, does not crumble in the face of a client's admissions, and cannot be reconciled with a "no harm, no foul" attitude toward client representation. Because Respondent failed to honor the duty he owed to Toner, we conclude his license to practice law should be suspended for ninety days.

## VI. ORDER

The Hearing Board therefore **ORDERS:**

1. **DEREK W. COLE,** attorney registration number 14761, is **SUSPENDED FOR NINETY DAYS.** The suspension **SHALL** take effect only upon issuance of an "Order and Notice of Suspension." [55]

2. Respondent **SHALL** file any post-hearing motion or application for stay pending appeal with the PDJ **on or before Monday, December 19, 2011.** No extensions of time will be granted. If Respondent files a post-hearing motion or an application for stay pending appeal, the People **SHALL** file any response thereto within five days, unless otherwise ordered by the PDJ.

3. Respondent **SHALL** pay the costs of these proceedings. The People **SHALL** submit a "Statement of Costs" within fifteen days from the date of this order. Respondent's response to the People's statement, if any, must be filed no later than ten days thereafter.

4. Respondent **SHALL** promptly comply with C.R.C.P. 251.28(a)-(c), concerning winding up of affairs, notice to parties in pending matters, and notice to parties in litigation. Respondent also **SHALL** file with the PDJ, within ten days of the issuance of the "Order and Notice of Suspension," an affidavit complying with C.R.C.P. 251.28(d).

---

**54.** 922 P.2d at 933.

**55.** In general, an order and notice of sanction will issue thirty-one days after a decision is entered pursuant to C.R.C.P. 251.19(b) or (c). In some instances, the order and notice may issue later than thirty-one days by operation of C.R.C.P. 251.27(h), C.R.C.P. 59, or other applicable rules.